OPINION. Withey, Judge: The first question for determination is whether the options granted to petitioner by Willys were given for the purpose of enabling petitioner to acquire a proprietary interest in that company or were given as compensation. The petitioner contends that they were given for the former purpose while the respondent urges that they were for the latter. The question is one of fact, Abraham Rosenberg, 20 T. C. 5, and has been resolved against the petitioner by our finding that the options were granted to him as compensation. At the outset we are faced with the situation where a comparatively small automotive producing corporation whose management was disturbed over the situation confronting it entered into a contract with one whose long experience and outstanding ability in automotive production had enabled him to command an annual salary of $250,000. By the contract the petitioner was prohibited, without the consent of Willys, for a period of 10 years from acting as an officer or director of any other corporation engaged in manufacturing or selling automobiles. In addition, petitioner was required to assign to Willys all inventions, designs, trade-marks, and copyrights, which in any way related to the business of Willys and its subsidiaries, which he might develop or perfect during the 10-year peritíd. Although the instrument providing for the money payments to the petitioner recites that Willys was to pay him, or his personal representatives in case of death, a total of $520,000 over the 10-year period, it contains nothing which indicates that said sum was to be the sole, or the full and complete, payment to the petitioner for the services and other matters which would be required of him under his employment. According to the record, the management of Willys readily acquiesced in petitioner’s demands not only as to the money payments and options but also as to the form and detailed contents of the written instruments relating thereto. Since in that situation the wishes and desires of the petitioner wore so dominant, his testimony as to how he determined the amount of the money payments and his reasons for demanding the options is of particular significance. In explanation of how he arrived at the $520,000 of money payments, the petitioner testified that he concluded that that was a reasonable amount to ask for his services for actively managing the company while he was building up an organization to take over the active management, for preparing a postwar production plan or program for the company, and for thereafter acting in a directory or advisory capacity as the plan was carried out. He felt that the development of an organization and the formulation of the program would require from a year to 18 months. Respecting the options he testified that he requested them because he desired a proprietary interest in the company so that at any time he wished, he could assert himself on anything he found necessary without being controlled by the group owning the stock of Empire Securities, Inc., and also in order that- he could interest himself in, and look after the interests of, the minority stockholders. All of the options upon their receipt by petitioner were immediately assignable and their exercise was in no way restricted to petitioner. Option No. 1 which was exercisable on January 1, 1945, contained no provision as to termination by Willys. All of the other options which were exercisable in successive later years provided that they should be terminable by Willys in case petitioner left its employment, or in case Willys should terminate his services for good cause prior to certain specified dates. Such a provision served to make the exercise of those options conditional upon the petitioner remaining in the service of Willys until specified dates or times. Thus it appears that there was a vital causal connection between the petitioner’s employment and his rendition of services and the right to acquire stock at the price stated in the options. Cf. Wanda V. Van Dusen, 8 T. C. 388, affd. 166 F. 2d 647. Although on June 12, 1944, the date on which the options were granted to petitioner, Willys common stock sold at 12y8 on the New York Stock Exchange, or for more than 4 times the price of $3 per share stated in the options, and although so far as appears the market value of the stock at all times material herein exceeded the option price, the petitioner never acquired any stock in Willys either under the options or otherwise, but sold all of the options. In view of the petitioner’s strong financial position, his failure to acquire any stock in Willys clearly was not ascribable to a lack of funds on his part. While Option No. 1 became exercisable on January 1, 1945, the petitioner, instead of thereupon exercising it and obtaining a proprietary interest in the company, thereafter, in April 1945, informed the respondent that he was not disposed to exercise the option but was considering its sale and requested a ruling from the respondent on the question of whether the gain resulting from the sale would be considered long-term capital gain. The requested ruling was at a time when the petitioner was president and actively in charge of Willys and was some 9 months or more prior to the time Mooney became president when, as stated by petitioner, his interest in the affairs of Willys subsided very materially. No explanation is offered as to why, if petitioner was interested in June 1944 in acquiring a proprietary interest in Willys, he was not disposed to do so in April 1945. So far as the record discloses, a proprietary interest in the latter month would have been equally as desirable as in the former month. According to petitioner, he decided not to exercise, but to sell, his options as a result of his conflicts with Mooney and the support given Mooney by Willys’ board of directors in matters which petitioner did not deem to be for the best interest of the company. The foregoing conflicts and the supporting action of the board of directors arose in 1946 and at times when the petitioner could have exercised Options No. 1 and 2 for a total of 32,500 shares. A decision to sell reached as a result of such a situation can scarcely be reconciled with the petitioner’s testimony that he desired to acquire a proprietary interest in the company in order that he could interest himself in, and look after the interests of, the minority stockholders. With things being done in 1946 by the president and the board of directors which petitioner deemed inconsistent with the best interest of the company, it would appear that his desire to acquire a proprietary interest in the company would have been enhanced if he actually had'been interested in the minority stockholders and had desired to look after their interests. While each of the options contained a provision that Willys would not take deductions from its income for tax purposes with respect to the exercise of the options and Willys has never done so, that fact under the circumstances here, does not appear to be of any greater significance than any other act or forbearance required by petitioner of Willys as a condition for entering its employment. Particularly is this true in view of what appears to have been the character of the evidence developed in the derivative suit by a stockholder of Willys against petitioner, Willys, and others. The record here shows that the evidence produced there convinced counsel for the stockholder that petitioner had rendered services to Willys which warranted the compensation paid and the options given him by Willys. In view of this, it would appear that in that suit the petitioner, Willys, and the other defendants sought to justify the granting of the options on the ground that the total of the money payments plus the options did not exceed the value of the petitioner’s services. Such a justification makes services of the petitioner the consideration for the options and, in turn, makes the options consideration for services. From a consideration of the foregoing in connection with all the other evidence bearing on the question, we have found as a fact that the options were granted to petitioner as compensation. The petitioner contends that in view of the provisions of I. T. 3795, 1946-1 C. B. 15, his transfers of the options to the Winfield Baird Foundation in 1946, 1948, and 1949 did not result in any income to him by way of compensation and that the respondent was barred from making a determination that the transfers did result in such income to him. Prior to April 12, 1946, Regulations 111, section 29.22 (a)-l, provided that: If property is transferred by a corporation to * * * an employee, for an amount substantially less than its fair market value, regardless of whether the transfer is in the guise of a sale or exchange, such * * * employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of (1) compensation for services rendered or to be rendered * * *. Subsequent to the decision by the Supreme Court in Commissioner v. Smith, 324 U. S. 177 (February 26, 1945), Regulations 111, section 29.22 (a)-1, were amended (T. D. 5507, dated April 12, 1946, 1946-1 C. B. 18) to provide that: If property is transferred by an employer to an employee for an amount less than its fair market value, regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value is in the nature of compensation and shall be included in the gross income of the employee. * * * Respecting options granted prior to February 26,1945, the amended regulations provided as follows: In the case of property transferred by an employer to an employee pursuant to the exercise of an option granted to the employee before February 26, 1945, the provisions of these regulations prior to the amendment made by this Treasury Decision [5507] shall apply. The respondent, on April 12, 1946, issued I. T. 3795, swpra. This ruling after first elaborating on the treatment to be accorded options granted by employers after April 12, 1946, to employees to purchase stock then dealt with such options granted prior to April 12, 1946. The ruling provides, in part, as follows: Section 22 (a) of the Internal Revenue Code includes in an employee’s taxable income any economic or financial benefit conferred on him as compensation, whatever the form or mode by which it is effected. (See Commissioner v. John H. Smith, 324 U. S., 177, Ct. D. 1633, C. B. 1945, 49; Old Colony Trust Co. v. Commissioner, 279 U. S., 716, Ct. D. 80, C. B. VIII-2, 222 (1929).) ******* Treasury Decision 5507, supra, does not apply to the case of the exercise or transfer, at whatever date, of an option which was granted to an employee prior to February 26, 1945, to purchase stock of the employer corporation, or of an affiliate of the employer corporation as set forth in section 141 (d) of the Internal Revenue Code. Accordingly, in view of the prior development of the regulations and interpretations relative to employee stock options * * *, as respects an option granted to an employee prior to February 26, 1946, unless at tbe time such option was granted there was a substantial difference between the fair market value of the stock and the option price therefor, or, within the purview of section 29.22 (a)-l of Regulations 111 prior to the amendments made by Treasury Decision 5507, supra, the employee would otherwise clearly realize income by way of compensation through the exercise or transfer of the option, this office will hold that the exercise or transfer of such option, as the case may be, does not result in income to the employee by way of compensation under the principles enunciated in the preceding paragraphs, provided, however, that on or before July 1, 1946, the employee to whom such option is granted and any transferee thereof, and the employer corporation or any other taxpayer who granted such option to the employee, file in duplicate with the Commissioner of Internal Revenue at Washington, D. C., written consents (1) agreeing that the basis to the employee, and to any transferee of the option, for the stock acquired or to be acquired pursuant to the option shall be the actual price paid therefor and that no deduction shall at any time be claimed attributable to any aspect of the option arrangement, under section 23 (a) (1) or any other subsection of the Internal Revenue Code, by the employer corporation or the taxpayer who granted the option, and (2) indemnifying the Commissioner against the filing of a claim for credit or refund, or any other action by any taxpayer concerned, inconsistent with the consents filed. The petitioner takes the position that the 2 letters addressed to the respondent, one from the petitioner dated June 29, 1946, and the other from Willys dated June 25, 1946, constituted the written consents contemplated by I. T. 3795 and that the handing of the letters to the assistant collector in Detroit on July 1, 1946, complied with the requirements of I. T. 3795 that such written consents be filed on or before that date with the Commissioner in Washington-, that at the time the options were granted it was not clear that he would realize income by way of compensation through the exercise or transfer of the options; that since the options were not immediately exercisable, there was at the time they were granted no substantial difference between the fair market value of the Willys stock and the option price therefor; and that, since the factual situation here thus comes within the provisions oí I. T. 3795, the respondent accordingly was barred from determining that the transfers of the options resulted in income to him by way of compensation. Without discussing in detail the correctness of the various conclusions upon which the petitioner rests his position, we think it sufficient to point out that at the time the options were granted to him there was a substantial difference between the fair market value of the stock (12y8 per share) and the option price ($3 per share), and, further, that the proceeds received upon a transfer of the options clearly would constitute income. From a consideration of I. T. 3795 we fail to find in it anything to indicate that it was intended to, or that it does, hold that in situations like that presented here an employee would realize no income by way of compensation upon a transfer of his option, or options, prior to the exercise thereof. Nor do we find anything in I. T. 3795 which precludes the respondent from ascertaining and determining what he considers to be the facts in a given case and thereupon determining what he considers to be the correct tax liability under the Internal Revenue Code. Consequently, petitioner’s contention is not sustained. The petitioner next contends that the amounts received by him upon the sale of the options did not constitute income in the nature of compensation and therefore ordinary income but constituted gain from the sale of capital assets which he had held for more than 6 months. Neither of the parties cites any decision involving a situation in which the employee, as here, disposed of his options instead of exercising them, nor have we found any. However, we think the applicable principles have been indicated by decisions involving related situations. In Commissioner v. Smith, supra, the taxpayer’s employer, as compensation for services, gave him an option to purchase a specified portion of certain stock at a stated price. The then market price of the stock was not in excess of the option price. Thereafter, and at times when the market value of the stock exceeded the option price, the taxpayer made purchases under the option. In holding that the excess of the market value of the stock at the time of purchase over the option price paid therefor constituted compensation for services, the Supreme Court said: And as the option was not found to have any market value when given, it could not itself operate to compensate respondent. It could do so only as it might be the means of securing the transfer of the shares of stock from the employer to the employee at a price less than their market value, or possibly, which we do not decide, as the option might be sold when that disparity in value existed. Hence the compensation for respondent’s services, which the parties contemplated, plainly was not confined to the mere delivery to respondent of an option of no present value, but included the compensation obtainable by the exercise of the option given for that purpose. * * * We have found that the options here involved were granted to the petitioner as compensation for services. Since no attempt was made at the hearing to show that at the time they were given the options had any fair market value, and since neither party contends here that they did have, and since the petitioner on brief states that “it cannot be said that the options had any ascertainable value at the time they were granted,” we proceed on the assumption that they did not have any market value at that time and that they, themselves, did not operate to compensate petitioner. In this situation, and since the petitioner did not exercise the options but sold them, we think, as the Supreme Court indicated, but did not decide, in the Smith case, that the sale of the options operated to compensate the petitioner for his services. Although only a portion of the selling price of the options sold in the respective years was received in cash during the years of sale and the remainder was represented by a note or notes, the petitioner has not attempted to show, and does not here urge, that at the time of receipt the note or notes had a fair market value of less than face value. We conclude therefrom that the notes then had a fair market value equal to their face amounts. In view of this, and since the options were received by petitioner for services and without the payment of cash or other property, we think that the selling price of the options measured the amount of the compensation received by the petitioner in the years in which the respective options were sold. Except for Option No. 3 all the options were presently exercisable when sold. However, at the time of the sale of Option No. 3 the time within which Willys could terminate it by terminating petitioner’s services had expired. Under the options the petitioner had the right to exercise them, and such income as would have resulted from their exercise would have been compensation for services and as such ordinary income. Instead of exercising his rights the petitioner sold them. In this situation, we think that what was said in Charles T. Fisher, 19 T. C. 384, affd. (C. A. 6, 1954) 209 F. 2d 513, is applicable, namely, “A sale of a right to receive in the future ordinary income already accrued produces ordinary income rather than a capital gain.” Accordingly, we conclude that the petitioner realized ordinary income and not capital gain from the sale of the options. The petitioner contends that even if the proceeds from the sale of the options are held not to be gain from the sale of capital assets held for more than 6 months, he, nevertheless, is entitled to report the income from the sales on the basis provided in section 44 of the Code for reporting income from sales of property made on the installment plan. Since the sales of the options operated to compensate petitioner for his services, what he received in the form of both cash and notes was income by way of compensation. The provisions of section 44 relate only to the reporting of income arising from the sale of property on the installment basis. Those provisions do not in anywise purport to relate to the reporting of income arising by way of compensation for services. Petitioner is not entitled to have them applied here. The final question is whether the period of limitations for assessment of income tax for 1946 and 1947 had expired when the respondent mailed the deficiency notices on March 5,1952. The pertinent portions of the Code are set out below.[1] In their joint income tax return for 1946 which was filed on June 16,1947, the petitioners reported a total gross income of $51,310.38 of which $11,375 was reported as taxable income from the sale of the Willys options. The respondent has determined that the income from the sale of the options in that year was $385,000 and we have sustained that determination. The difference between the $385,000 and the $11,375, or $373,625, was omitted from the return of the petitioners. Since the amount omitted is in excess of 25 per cent of the amount stated in the return, the period of limitations for making assessment of income tax for 1946 was 5 years from June 16, 1947, or until June 16, 1952, and since the deficiency notice was mailed prior to the latter date, the period for assessment of tax for 1946 had not expired. On March 11, 1948, the petitioners filed their separate income tax returns for 1947. Since a deficiency for 1947 has been determined only against petitioner Charles E. Sorensen, the issue as to that year relates alone to him. On February 27,1951, and prior to the expiration of the 3-year period for assessment of tax for 1947, he filed a consent with the respondent extending the period for assessment to June 30, 1952. Since the deficiency notice for 1947 was mailed on March '5, 1952, the period for assessment of tax for 1947 had not expired. Reviewed by the Court. Decisions will he entered imder Rule 50. SBC. 275. PERIOD OP LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276— (a) General Rule. — The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. [[Image here]] (c) Omission prom Gross Income. — If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. SEC. 276. SAME — EXCEPTIONS. (b) Waivbr. — Where before the expiration of the time prescribed in section 275[1] for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously, agreed upon.