WILLIAM E. ROBERTS AND AILEEN V. ROBERTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roberts v. Commissioner
Docket No. 3258-79.
United States Tax Court
T.C. Memo 1983-143; 1983 Tax Ct. Memo LEXIS 638; 45 T.C.M. (CCH) 1012; T.C.M. (RIA) 83143; March 21, 1983. *638 Taxpayer (TP) was a fifty percent partner in a partnership (PS) which owned a medical office building. PS leased space in the building to various tenants including a hospital, doctors and dentists. When a new tenant leased space in the building from PS, PS would often incur an obligation to make improvements on the leasehold for the incoming tenant's benefit at its own expense. In 1976 PS sold the building to a purchaser (P). At closing, P assumed the existing leases between PS and tenants of the medical office building. However, PS agreed that it would complete for P's benefit its existing obligations to improve certain of the leaseholds. In turn, P agreed to reimburse PS for the costs of completion. Held, payments received for the performance of services are not payments on a sale of real or personal property within the meaning of section 453(b), I.R.C. 1954. Held,further, payments made by P for improvements completed after closing were for the provision of services. Held,further, PS received payments from P during the year of sale which did not exceed thirty percent of the selling price for the medical building. Thus, PS may report its gain on the sale using the installment *639 method of section 453, I.R.C. 1954. John H. Doran, for the petitioners. Darwin R. Thomas, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge:* Respondent determined a deficiency in petitioners' 1976 Federal income tax in the amount of $58,779. Due to concessions by the parties, the sole issue for our consideration is whether payments received during 1976 on the sale of real property by a partnership, in which petitioner William E. Roberts (hereinafter Roberts or petitioner) was a partner, exceeded 30 percent of the property's selling price. Resolution of this issue determines whether the partnership is entitled to report gain on the sale using the installment method of section 453, [1] and accordingly affects the amount of Roberts' distributive share of partnership gain for 1976. FINDINGS OF FACT Most of the facts have been stipulated and are found accordingly. *640 The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners William E. Roberts and Aileen V. Roberts resided in Portland, Oregon, when they filed their petition herein. They are cash basis taxpayers. At all times relevant to this case, Roberts was a 50 percent partner in B & D Development Co. (hereinafter the partnership). He shared the partnership's gain, losses, and profits equally with his brother, who was the other 50 percent partner. The partnership was in the business of owning and managing commercial real property in Portland and elsewhere. It filed its partnership information returns (Forms 1065) using the cash basis method of accounting. In September of 1970, the partnership purchased the Portland Medical Center (the property). This consisted of land and an office building located thereon, together with a leasehold interest in an adjoining parking facility. The partnership thereafter owned and managed the property continuously until its sale in June of 1976. At the time of the purchase, office space in the property was leased to various tenants. As each lease expired, the partnership relet the space covered thereby *641 using its own standard lease form. With certain exceptions not pertinent here the standard lease form was used on all leases. Under this form, the partnership was obligated to furnish electric current, lamps, elevator service, heat, and janitorial services to its tenants. In addition, the partnership was obligated to pay all real property taxes and assessments levied against the Portland Medical Center, all premiums for fire, extended coverage, and other insurance customarily carried by owners of office buildings in downtown Portland, all expenses for the maintenance and repair of the roof, exterior walls, windows, sidewalks, lobbies, public corridors, and rest rooms located upon or within the Portland Medical Center, and all costs of heating, air conditioning, elevator service and plumbing, and electrical systems serving the property. [2]
When a prospective tenant inquired about renting space in the property, the tenant and a representative of the partnership would discuss the installation of any improvements which the tenant desired. *642 They would then negotiate a monthly rent for the space. In such negotiations the partnership took into consideration the estimated cost of providing the improvements and sought to recover such cost over the term of the lease. Following the negotiation of mutually acceptable terms, the partnership, using its standard form, prepared and submitted a lease to the prospective tenant for his approval and acceptance. Accompanying the lease was a transmittal letter which, among other matters, described the improvements to be installed at the partnership's expense. In some cases, the letter of transmittal described additional improvements to be installed by the partnership at the tenant's expense. Following the execution and return by the lessee of the lease and a copy of the transmittal letter, the partnership usually engaged Wayne Glasnapp (the contractor) to install the improvements. The partnership's agreement with the contractor was based upon an estimate by the contractor and was oral rather than written. Through a course of dealing over many years, it was understood that the partnership would be billed for labor, materials, and subcontracts actually furnished by the contractor, *643 plus a reasonable allowance for overhead and profit, regardless of any variation in the amount thereof from the contractor's earlier estimate. It was further understood that the agreement could be terminated at will by either party. In a typical case, the contractor installed the improvements and billed the partnership for the entire cost. The partnership would pay the contractor and then bill the tenant for the cost of any improvements which it had agreed to install at the tenant's expense. Prior to June 18, 1976, the partnership engaged in negotiations with prospective tenants for the lease of suites which had become (or were about to become) vacant, as follows: Suite
Prospective Tenant(s)
1104
U.S. Dental Laboratory
708
Dr. John V. Krippaehne
714
Drs. Doty, Kane and Regan
401
Dr. Glenn Shimshack
Ground Floor
Local Loan Co.
After negotiations had been completed, the partnership sent to each of these tenants a transmittal letter and a standard lease form. With respect to the particular improvements for suite 708, the transmittal letter provided as follows: (4) IMPROVEMENTS: The owner agrees to prepare the space for occupancy by the tenant, including reasonable amounts of partitions with *644 painted surfaces and doors and hardware. In addition, the owner agrees to install the ceiling, light fixtures, heat and air conditioning, vinyl floor covering and a reasonable number of telephone and electrical outlets and plumbing in accordance with standard building practices. Tenant agrees to pay for other improvements which it may wish to make to the premises including, but not limited to, the cost of cabinets, counters, shelving, paneling, or other millwork, in any other improvements and additions in the leased premises which said improvements must be approved by the building architect, but such approval will not be unreasonably withheld. The terms in the transmittal letters relating to improvements in the other suites were similar to those provided for in the transmittal letter on suite 708. As each lease was executed by the lessee, [3] the partnership engaged the contractor to make the improvements covered by that lease. In 1976, the partnership decided to sell the *645 property to Portland Medical Center, Inc. (hereinafter purchaser). Roberts was the partner responsible for negotiating the sale. He determined the expected capitalized cash flow from the property before depreciation and amortization and after debt service to ascertain a sales price acceptable to the partnership. In his negotiations with the purchaser, Roberts disregarded the original cost of the property and in fact made no computation or determination with respect to its historical, replacement, reproduction, or depreciated cost. On June 1, 1976, the purchaser signed a written agreement with the partnership to buy the property. The opening paragraph provided in part as follows: We [partnership] hereby offer to sell and you [purchaser] agree to purchase all of our right, title and interest in the Portland Medical Center * * * [description of the property and deeds] together with all of the tools and supplies owned by us, used in connection with the operation of the building and now located on such premises except those consumed in the ordinary operation of the building from this date until the Closing, all for the sum of Two Million Five Hundred Seventy-Five Thousand United States *646 Dollars ($2,575,000.00) * * *. The next paragraph specified that the $2,575,000 would be paid by the purchaser as follows: (1) $50,000 as earnest money on June 1, 1976; (2) $700,000 at the closing on June 18, 1976; (3) $1,285,195.90 by assuming a mortgage on the real property; and (4) $539,804.10 by the execution of a promissory note due in 1982 together with interest at eight and one-half percent. [4]
During the negotiations, the parties became aware that the improvements being made by the contractor in suites 401, 708, 714, 1104, and on the ground floor, would not be completed by the closing on June 18, 1976. Therefore, the partnership agreed to complete these improvements, and the purchaser agreed to reimburse the partnership for the cost thereof up to $71,000. They formalized this arrangement in paragraph 4 (hereinafter Paragraph 4) of the buy and sell agreement as follows: 4. At the time of Closing, in addition to all of the other payments to be made by you to us hereunder, you are to pay to us in cash or by certified or cashier's *647 check the construction and remodeling costs paid by us up to the date of Closing, for tenants' improvements in Suite 1104 (U.S. Dental Lab), Suite 708 (Dr. John V. Krippaehne), Suite 714 (Dr. Gordon Doty), Ground Floor Tenant (Local Loan Co.), and Suite 401 (Dr. Glenn Shimshack). Thereafter you will reimburse us upon presentment of invoices for all cost paid by us, for such tenants' improvements following Closing not to exceed however, Seventy-One Thousand United States Dollars ($71,000.00) to be paid by you at and after Closing. We agree that such tenants' improvements will be made in accordance with our agreements with such tenants and City Building Codes free and clear of labor and material liens. On June 18, 1976, the closing and transfer of title under the agreement occurred. At that time, the purchaser paid the partnership $700,000 by check to supplement the $50,000 earnest money it had paid on June 1. In addition, the purchaser reimbursed the partnership in the amount of $18,169 for improvements which the contractor had installed and billed by that time. The partnership had also incurred a liability to the contractor for improvements in the amount of $14,109. [5] However, *648 the contractor had not yet billed these costs to the partnership at the time of closing. Subsequent to the sale of the property, Drs. Doty, Kane, and Regan refused or otherwise failed to execute and deliver a lease covering suite 714. The partnership then orally agreed with the purchaser to reduce the $71,000 limitation on reimbursements under paragraph 4 of the agreement by $22,154 to $48,846. The $22,154 amount represented the difference between the estimated cost of improvements for suite 714 ($23,000) and the cost actually incurred by the partnership ($846). On June 24, 1976, the purchaser sent a transmittal letter and lease to a prospective tenant for suite 615. The transmittal letter provided that the purchaser, as lessor, agreed to install improvements in the suite. The improvements which the purchaser agreed to make were similar to those which the partnership had installed for its tenants prior to the sale of the property. Although the partnership was not a party to the purchaser's agreements with the tenant for suite 615, it offered to oversee the installation of the improvements *649 in exchange for reimbursement of costs as an accommodation to the purchaser. In September and November 1976, the purchaser reimbursed the partnership for another $25,000 in improvements to office space in the Portland Medical Center. Of this amount, $14,109 was allocable to the costs incurred prior to the closing. The remaining $10,891 was allocable to costs incurred by the partnership after the closing. [6]
On its 1976 return the partnership elected to report its gain on the installment method provided in section 453. It considered the selling price of the Portland Medical Center to be $2,575,000. [7] *650 It listed the payments it received in 1976 as totalling $750,000, being composed of the $50,000 earnest money payment and the $700,000 check received at the closing. It did not include any part of the reimbursement it received for the improvements in the selling price, nor in the payments it received in 1976 for the property. Respondent determined that the partnership was not entitled to report its gain on the sale of the Portland Medical Center using the installment method. Thus, he concluded that the partnership had additional gain in 1976, and thereby increased Roberts' 1976 income by his distributive share of such gain. For this reason, he determined a deficiency in petitioners' Federal income taxes for 1976. OPINION Section 453 provides generally that income from an installment sale shall be recognized over a period of more than one taxable year. However, installment sales of real property qualify for installment method reporting only if certain limitations are observed. In particular, section 453(b)[8] reads as follows: (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.-- (1) GENERAL RULE.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis *651 and in the manner prescribed in subsection (a). (2) LIMITATION.--Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such code. Respondent contends that the sale of the Portland Medical Center property does not qualify for installment method reporting. He argues that the payments received by the partnership during 1976 exceeded 30 percent of the Portland Medical Center selling price and thus exceeded the limitation of section 453(b)(2)(A)(ii). He asserts that the *652 selling price for the property was $2,629,859. This sum includes the maximum reimbursement ($48,846) which the purchaser could be required to pay to the partnership for office space improvements. [9] He further asserts that the payments made by the purchaser to the partnership during 1976 equalled $793,169. This sum includes the $43,169 paid by the purchaser during 1976 as reimbursement for the partnership's cost of office space improvements. Respondent thus determined that the partnership received payments during 1976 which equalled 30.16 percent of the selling price and accordingly exceeded the 30 percent limitation of section 453(b). Petitioners insist that the partnership satisfied the 30 percent limitation of section 453(b). They maintain that the selling price of the Portland Medical Center property equalled $2,581,013, [10] while the payments received in 1976 equalled $750,000, or 29.06 percent of the selling price. They contend that the reimbursement agreement and payments received *653 pursuant to Paragraph 4, with respect to the office space improvements, were payments attributable to services, not to property. Thus, petitioners argue that respondent improperly included these sums in the selling price of, and the payments received in 1976 for, the Portland Medical Center Property. Sale of Services Not Eligible for Installment Sale Reporting
When a taxpayer sells real property, or makes a casual sale of personal property, section 453(b) allows him to report his gain using the installment method, provided that the purchaser's payments on the sale do not exceed certain limitations. However, if the taxpayer sells a property interest other than real property or casual sales of personal property, such as services or inventory, the installment sale provisions of section 453(b) do not apply at all. For example, in Sorensen v. Commissioner,22 T.C. 321, 342 (1954), [11] the taxpayer was given several options to purchase stock as compensation for his services. He sold these options rather than exercising them, and attempted to report his gain under section 44(b), I.R.C. 1939, *654 the predecessor to section 453. We held that the installment sale provisions did not apply to the sale because "[t]he provisions of section 44 relate only to the reporting of income arising from the sale of property on the installment basis. Those provisions do not in anywise purport to relate to the reporting of income arising by way of compensation for services." 22 T.C. at 342. As a result, when a taxpayer makes a sale which includes real property, casual personal property, and other property, the selling price and payments for the "other" property may be separated from the selling price for the real and casual personal property for purposes of applying the installment sale provisions. For instance, in Monaghan v. Commissioner,40 T.C. 680 (1963), the taxpayer sold a liquor business. We held that the sales price of the liquor inventory, and payments received thereon, were not to be considered in determining whether the sale of the business qualified for installment method reporting. Similarly, in Rev. Rul. 68-13, 1968-1 C.B. 195, respondent permitted an allocation of the contract price to specific assets in the contract, so that the initial payments on the contract could be *655 attributed to inventory and thus ignored for purposes of section 453. Accordingly, we conclude that if Paragraph 4 of the closing agreement includes compensation for services, such compensation is separable from the sales price of, and the 1976 payments made on, the Portland Medical Center for purposes of section 453. Agreement to Install Improvements was a Service Obligation
The explicit language used in the agreement for the sale of the Portland Medical Center, as well as the objective intent of the partnership and purchaser, manifested by their conduct subsequent to closing, shows that Paragraph 4 related to the provision of services. First, the agreement separates the provisions for the sale of the real property from the provisions relating to the installment of improvements. In particular, the opening paragraph on page 1 of the agreement states: We hereby offer to sell and you agree to purchase * * * the Portland Medical Center * * * for the sum of Two Million Five Hundred Seventy-Five Thousand United States Dollars ($2,575,000.00). * * * Immediately thereafter, and also on page 1, appears paragraph 1, containing subparagraphs *656 A through C, setting forth in detail the manner in which the purchaser is to pay the $2,575,000. Paragraph 4 does not appear until the fourth page of the agreement, and opens with the phrase "[a]t the time of Closing, in addition to all of the other payments to be made by you [purchaser] to us [partnership] hereunder * * * you are to pay to us * * * construction and remodeling costs." [Emphasis added.] This separation of paragraphs and prices shows that the sale of the real property and the installment of the improvements were treated by the parties as different obligations. Second, all references to the improvements are couched throughout the agreement in language consistent with the furnishing of services. Paragraph 4 refers to "construction and remodeling costs," and states that the partnership will make the improvements "in accordance with" the transmittal letters. The transmittal letters, in turn, recite that the "owner [partnership] agrees to prepare the space for occupancy." [Emphasis added.] Moreover, paragraph 7 states that the necessary installations will be made by the "furnishing of labor and materials in conjunction with these [office] spaces * * *." We further observe *657 that the agreement contains no specifications as to particular improvements which the partnership was to install. Instead, Paragraph 4 referred only to such improvements as were required under the terms of certain leasing agreements entered between the partnership and five tenants. Similarly, Paragraph 4 contained no mandatory language to the effect that improvements of a certain value were to be installed. It merely provided that up to the designated maximum such improvements as were actually installed pursuant to the leasehold obligations would be reimbursed. Moreover, all improvements were to be made to newly leased suites, not to currently occupied leaseholds. This identity between improvements as provided in Paragraph 4 and in the transmittal letters for the newly leased suites shows that Paragraph 4 related to the performance of obligations owed to and desired by tenants of the Portland Medical Center, rather than improvements owed to or desired by the purchaser. The flexibility of the purchaser and partnership in changing the partnership's installation obligations once closing had occurred also indicates that Paragraph 4 related to services. For instance, after the prospective *658 tenants for Suites 714 failed to execute their lease, the purchaser and partnership orally agreed to reduce the maximum reimbursement available to the partnership under Paragraph 4 by the amount which had been allocated to that suite. Similarly, when the purchaser entered into an agreement with a new tenant shortly after the closing, the partnership agreed to install the additional improvements, even though it was not obligated to do so. If the improvements provided for in Paragraph 4 were considered by the partnership and purchaser to be part of the real property being sold, they would not have so readily made adjustments based solely on the desires of incoming tenants. The above factors indicate to us that Paragraph 4 related to the sale of services. This view is confirmed by Oregon landlord-tenant law and contract law relating to covenants running with the land. Prior to the sale of the Portland Medical Center, the partnership was obligated to install improvements on certain leaseholds. These obligations "touched and concerned" the leaseholds, because they directly affected the leaseholds. See, e.g., Abbott v. Bob's U-Drive,222 Or. 147, 352 P.2d 598 (1960); Wallace v. Paulus Bros. Packing Co.,191 Or. 564, 231 P.2d 417 (1951). *659 In addition, by the terms of the lease, the rights and obligations under the lease were intended by the landlord and the tenants to pass to their respective successors in interest. [12] As a result, the obligation to install the improvements "ran" with the land. See, e.g., Jack Mathis General Contractors, Inc. v. Murphy,256 Or. 233, 472 P.2d 820 (1970); Hudspeth, v. Eastern Oregon Land Co.,247 Or. 372, 430 P.2d 353 (1967). Covenants, or promises, which run with the land, obligate a transferee, in this case the purchaser, to perform the duties of the transferor, in this case the partnership. As a result, when the partnership and purchaser executed their agreement to transfer the Portland Medical Center, the purchaser became obligated to the tenants to install the improvements listed in the leases. [13] To ensure that these duties would be satisfied, the purchaser could have hired a third-party contractor. Instead, the purchaser agreed *660 to reimburse the partnership in return for the promise of the partnership to oversee the installation of the improvements. [14] An arrangement, such as the agreement appearing in Paragraph 4, whereby a party contracts out its duties to install improvements--a service obligation--is not a sale of real property, but a sale of services. [15] *661 In sum, the explicit language of the sales agreement, the conduct of the parties thereto, and the operation of Oregon property and contract law, compel us to conclude that Paragraph 4 related to the sale of services. As discussed above, compensation for services does not qualify *662 for installment method reporting, and in this case must be eliminated from the sale of the Portland Medical Center. Eligibility for Installment Sale Reporting
During 1976, the amount of $43,169 [16] was paid by the purchaser to the partnership as reimbursement for improvements made to the leaseholds specified in Paragraph 4. Of this amount, $32,278 represented improvements made before the closing, and $10,891 represented improvements made after closing. Under Oregon law, improvements in place at the time of a sale of real property are considered part of the real property. See, e.g., State of Oregon v. Superbilt Manufacturing Co., Inc.,204 Or. 393, 281 P.2d 707, 710 (1955). [17] *663 Thus, payments by the purchaser for improvements which were already installed at the time the Portland Medical Center property was sold [18] are included in the sale of the real property. However, as discussed above, payments made for leasehold improvements completed after the Portland Medical Center was sold were for the performance of services. These payments are separate from, and do not get included in, the contract price for the sale of the Portland Medical Center. In conclusion, the selling price for the Portland Medical Center totalled $2,613,291, and was comprised of (1) the recited contract price of $2,575,000, (2) additional consideration of $6,013 for an account payable assumed by the purchaser, and (3) $32,278 for improvements in place at the time of the sale, Payments received by the partnership in 1976 totalled $782,278, which amount was comprised of (1) $50,000 earnest money, (2) $700,000 paid at closing, and (3) $32,278 paid for improvements in place at the time of the sale. Since the payments made during 1976 on the sale do not exceed 30 percent of the selling price, the partnership is entitled to report its gain on the sale by the installment method, as provided in section 453(b). Accordingly, respondent's determination with respect to the petitioner's distributive share of partnership gain during *664 1976 will not be sustained. Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge, the case was reassigned to Judge Perry Shields↩ for disposition. 1. All section references are to the Internal Revenue Code of 1954, as amended during the year in issue.↩
2. A few leases contained exceptions to these provisions. Two tenants provided their own janitorial services and two paid the cost of their electricity.↩
3. The papers sent to Drs. Doty, Kane, and Regan for suite 714 bear the handwritten notation "Void-deal not acceptable." This notation was made after the partnership sold the Portland Medical Center property, infra.↩
4. The parties agree that the partnership received an additional consideration of $6,013 in the form of an account payable assumed by the purchaser.↩
5. The total cost of improvements incurred prior to the closing was $32,278 ($18,169 plus $14,109).↩
6. The total reimbursements for improvements made in 1976 thus totalled $43,169 ($25,000 plus the $18,169 paid at the closing).↩
7. The parties have stipulated, however, that the selling price should be increased by a $6,013 account payable assumed by the purchaser. See supra↩ n. 4.
8. Sec. 453(b)↩, as in effect prior to amendment by Pub. L. 96-471, 94 Stat. 2247 (1980).
9. Although the written agreement stated $71,000 to be the maximum reimbursement, the contracting parties agreed to reduce this amount when improvements on one suite were no longer required, supra.↩
10. The $2,575,000 set out in the agreement plus the account payable of $6,013. See n. 7, supra.↩
11. See also Hyatt v. Commissioner,T.C. Memo. 1961-318↩.
12. Whether or not they intended the covenant to run, the purchaser agreed to assume the leases. This operates as an acceptance in contract of the benefits and burdens under the lease. See 2 Restatement, Property 2d, sec. 16.1↩, Reporter's Note 5 (1977).
13. The partnership remained secondarily liable to the tenants to perform in the event that the purchaser failed to perform. 2 Restatement, Property 2d, sec. 16.1, Comment c↩ (1977). 14. A party's promise to a third party to perform that which he is already obligated to do for another constitutes consideration sufficient to support a contract. See 2 Restatement, Contracts 2d, sec. 73, Comment d (1981). Moreover, a promise to forbear from suing for reimbursement constitutes valuable consideration, and will be implied from a contract which requires performance. See 2 Restatement, Contracts 2d, sec. 75, Comment c↩ (1981). 15. The case of Pope v. Commissioner,T.C. Memo. 1965-211, which petitioners cite as being distinguishable is, in fact, distinguishable from the present case. In Pope, the taxpayer sold shell houses in six basic styles, with certain "extras" available. The taxpayer installed the houses on purchaser-provided land. We found that the taxpayer was in the business of selling real property, and not services, for purposes of section 453. The partnership herein was not in the business of selling commercial rental properties, with certain improvements available. As stipulated by the parties, it was in the business of owning and managing commercial properties. The improvements it installed were "obligations incurred * * * in the usual and customary course of its business." These obligations later passed to the purchaser under Oregon property law, when the purchaser acquired the Portland Medical Center (which petitioners agree was the real property). In Pope, there were no tenants, no continuing obligations, and no activities involved other than the sale of assembled houses. Thus, Pope↩ is completely distinguishable from the present case on its facts.
16. See supra↩ n. 6. 17. See also Marnon v. Vaughan Motor Co.,184 Or. 103, 194 P.2d 992 (1948), under which the partnership's promise to install leasehold improvements which are already in place is inadequate consideration to support as contract. 18. The parties do not question, nor do we resolve, whether improvements completed between the time the sales agreement was executed and the time the deal closed were fixtures or for services.↩